UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI

| | |
|---|---|
| CHAZMINE ENGLISH, as p/n/g/ of C.L. and | : |
| | : |
| J.L., BRITTANY LYNCH, as p/n/g/ of C.L., and | : |
| | : |
| TERRA AARON, as p/n/g/ of C.A.L., and | : |
| | : |
| LAURIE BEY; | : |
| | : Civil Action No. |
| Plaintiffs, | : 4:21-cv-0446 |
| | : |
| v. | : |
| | : |
| ERIC J. DEVALKENAERE; | : JURY TRIAL DEMANDED |
| | : |
| And | : |
| | : |
| KANSAS CITY BOARD OF POLICE | : |
| COMMISSIONER MARK | : |
| TOLBERT in official capacity; | : |
| | : |
| And | : |
| | : |
| KANSAS CITY BOARD OF POLICE | : |
| COMMISSIONER CATHY DEAN | : |
| In official capacity; | : |
| | : |
| | : |
| And | : |
| | : |
| KANSAS CITY BOARD OF POLICE | : |
| COMMISSIONER DON WAGNER | : |
| In official capacity; | : |
| | : |
| And | : |
| | : |
| KANSAS CITY BOARD OF POLICE | : |
| COMMISSIONER Dawn Cramer | : |
| In official capacity; | : |
| | : |

| | |
|---|---|
| **And** | : |
| | : |
| | : |
| **KANSAS CITY BOARD OF POLICE** | : |
| **COMMISSIONER QUINTON LUCAS** | : |
| **In official capacity;** | : |
| | : |
| **And** | : |
| | : |
| **JOHN DOES 1-3** | : |
| | : |
| **Defendants** | : |

## PLAINTIFFS' SECOND AMENDED COMPLAINT

**NOW COMES** Chazmine English, parent and natural guardian of C.L. and J.L., Brittany Lynch, parent and natural guardian of C.L., Terra Aaron, parent and natural guardian of C.A.L., and Laurie Bey complaining of Defendants Eric DeValkenaere, and Kansas City Board of Police Commissioners, and for cause would show the Honorable Court as follows:

1. On December 3, 2019, Eric DeValkenaere shot and killed Cameron Lamb as he sat in his car in his own garage.

2. This is an action brought by the Plaintiffs against Defendants, Eric DeValkenaere and Kansas City Board of Police Commissioners by and through Mark Tolbert, Cathy Dean, Don Wagner, Dawn Cramer, and Quinton Lucas, all in their official capacities and for their failures, policies, and actions set forth herein, for DeValkenaere's unlawful entry onto Mr. Lamb's property and his use of excessive and deadly force under the color of state law resulting in the death of Cameron Lamb in violation of his rights under the Fourth Amendment of the United States Constitution.

3. Plaintiffs bring this action pursuant to Missouri's wrongful death statute. §537.080 *et seq.* R.S.Mo.

4. Plaintiffs English, Lynch, and Aaron bring wrongful death claims on behalf of Cameron Lamb's minor children C.L., J.L., C.L., and C.A.L.

5. Plaintiff Laurie Bey brings wrongful death claims as Cameron Lamb's natural mother.

6. C.L., J.L., C.L., and C.A.L. are the only children of Cameron Lamb.

7. Plaintiffs allege that Eric J. Devalkenaere unlawfully entered on Cameron Lamb's private property and used unlawful excessive deadly force in violation of the 4th Amendment to the United States Constitution.

8. Plaintiffs allege the Kansas City Board of Police Commissioners, failed to properly train, supervise, screen, discipline, transfer, counsel or otherwise properly equip and control police officers in the Kansas City Missouri Police Department including those who are known, or who should have been known, to engage in the use of excessive force and/or deadly force.

9. The Kansas City Board of Police Commissioners had a duty to, but failed to, implement and/or enforce training, policies, practices, and procedures for the Kansas City Missouri Police Department that respected and protected Cameron Lamb's constitutional rights.

10. The Kansas City Board of Police Commissioners' failure to adequately supervise, discipline, and train Defendant DeValkenaere, failure to implement the necessary policies and procedures, and affirmative implementation of unconstitutional policies and/ or practices caused Cameron Lamb's unwarranted and excruciating physical and mental anguish and death.

11. The Kansas City Board of Police Commissioners had knowledge of the continuing, widespread, persistent pattern of unconstitutional misconduct of the Kansas City Missouri Police Department and the likelihood that this unconstitutional misconduct would result in

the violation of the constitutional rights of inhabitants but, with deliberate indifference, failed to take any steps to rectify these failures.

12.    For these civil rights violations and other causes of action discussed herein, Plaintiffs seek redress and compensation for damages and the wrongful death of Cameron Lamb.

**<u>PARTIES</u>**

11.    Plaintiff Chazmine English is the parent and natural guardian of C.L., the minor child of Cameron Lamb, and an adult individual and resident of the state of Missouri.

12.    Plaintiff Chazmine English is the parent and natural guardian of J.L., the minor child of Cameron Lamb, and an adult individual and resident of the state of Missouri.

13.    Plaintiff, Brittany Lynch is the parent and natural guardian of C.L., the minor child of Cameron Lamb, and an adult individual and resident of the state of Missouri.

14.    Plaintiff, Terra Aaron is the parent and natural guardian of C.A.L., the minor child of Cameron Lamb, and an adult individual and resident of the state of Missouri.

15.    Plaintiff, Laurie Bey is the natural mother of Cameron Lamb, and an adult individual and resident of the State of Missouri.

16.    Defendant Eric DeValkenaere was at all relevant times a duly sworn police officer and a detective with the Kansas City Missouri Police Department.

17.    Defendant Mark Tolbert is a member of the Kansas City Board of Police Commissioners. The Kansas City Board of Police Commissioners is the board appointed by the Missouri State government to oversee the operations of the Kansas City Missouri Police Department and the final authority on the day-to-day operation of the police department, including tactical operations, training, discipline, screening, and other matters. Mark Tolbert is a policymaker of the Kansas City Police Department. He is sued only in his official capacity only.

18. Defendant Cathy Dean is a member of the Kansas City Board of Police Commissioners. The Kansas City Board of Police Commissioners is the board appointed by the Missouri State government to oversee the operations of the Kansas City Missouri Police Department and the final authority on the day-to-day operation of the police department, including tactical operations, training, discipline, screening, and other matters. Cathy Dean is a policymaker of the Kansas City Police Department. She is sued in her official capacity only.

19. Defendant Don Wagner is a member of the Kansas City Board of Police Commissioners. The Kansas City Board of Police Commissioners is the board appointed by the Missouri State government to oversee the operations of the Kansas City Missouri Police Department and the final authority on the day-to-day operation of the police department, including tactical operations, training, discipline, screening, and other matters. Don Wagner is a policymaker of the Kansas City Police Department. He is sued in his official capacity only.

20. Defendant Dawn Cramer is a member of the  Kansas City Board of Police Commissioners. The Kansas City Board of Police Commissioners is the board appointed by the Missouri State government to oversee the operations of the Kansas City Missouri Police Department and the final authority on the day-to-day operation of the police department, including tactical operations, training, discipline, screening, and other matters. Dawn Cramer is a policymaker of the Kansas City Police Department. She is sued in her official capacity only.

21. Defendant Quinton Lucas is a member of the Kansas City Board of Police Commissioners. The Kansas City Board of Police Commissioners is the board appointed by the Missouri State government to oversee the operations of the Kansas City Missouri

Police Department and the final authority on the day-to-day operation of the police department, including tactical operations, training, discipline, screening, and other matters. Quinton Lucas is a policymaker of the Kansas City Police Department. He is sued in his official capacity only.

## JURISDICTION AND VENUE

20. Jurisdiction exists in this Honorable Court pursuant to 28 U.S.C. §§ 1331 and 1343 as this action is brought pursuant to 42 U.S.C. § 1983 to redress a deprivation of the Fourth Amendment rights of the decedent Cameron Lamb. Plaintiffs further invoke the supplemental jurisdiction of this Court pursuant to 28 U.S.C. § 1367 to adjudicate pendent state law claims.

21. Venue is proper in this Honorable Court as Defendants' constitutional violations and intentional torts and otherwise violative conduct occurred within the Western District of Missouri.

## THE KILLING OF CAMERON LAMB

22. On or about, December 3, 2019 Defendant DeValkenaere was on-duty as a plain-clothes detective with the Kansas City Missouri Police Department.

23. On that date, after being notified by an undercover police officer that Cameron Lamb was driving fast following another vehicle, a police helicopter observed the red pickup truck driven by Cameron Lamb. The helicopter patrols by the Kansas City Missouri Police Department primarily occurred in the area east of Troost Avenue.

24. The helicopter pilot observed Mr. Lamb slowly drive to his home at 4154 College Avenue Kansas City, Missouri.

25. Mr. Lamb then slowly drove up the driveway to the back of his home where the garage was located and began backing into his garage.

26. Shortly thereafter, Defendant DeValkenaere and Kansas City Missouri Police Department Detective Schwalm arrived at Cameron Lamb's home.

27. They did not have a warrant to enter the property.

28. Both Detective Schwalm and Defendant DeValkenaere were in plain clothes and unmarked vehicles.

29. At the time that Detective Schwalm and Defendant DeValkenaere arrived at the property, Roberta Merritt was sitting on the front porch of the home.

30. Ms. Merritt was a resident of the home.

31. Detective Schwalm did not even acknowledge her presence.

32. Defendant DeValkenaere, arriving just after Detective Schwalm, pulled his firearm and began shouting at Ms. Merritt demanding to know who was in the backyard.

33. Ms. Merritt never gave the officers permission to enter the property, nor did the officers ever ask.

34. Nonetheless, both Schwalm and Defendant DeValkenaere stormed around the side of the house and into the backyard.

35. Defendant DeValkenaere knocked over a barbecue grill and a car hood to gain access to the yard.

36. As the detectives entered the backyard, Mr. Lamb was slowly backing his truck down the slope into his garage.

37. Mr. Lamb had his left hand on the steering wheel and in his right hand was his cellphone which he was using to make a phone call while holding it down near the seat. A voicemail left from his phone captures the moments immediately following the shooting.

38. Detective Schwalm confirmed to an investigating grand jury that he saw Mr. Lamb's left hand on the steering wheel and did not observe Mr. Lamb with a weapon.

39. Nonetheless, Defendant DeValkenaere without providing any warning, discharged his firearm four times, striking Cameron twice, killing him.

## FAILURES OF THE KANSAS CITY POLICE DEPARTMENT

40. The Kansas City Police Department has a well-documented, continuing, widespread, and persistent pattern of utilizing excessive and often deadly force when it is not warranted under the totality of the circumstances.

*Systemic Issues*

41. Between 2005 and the present, the Kansas City Police Department displayed a consistent and systematic failure to properly train and supervise its officers on the proper use of force, and techniques and principles of de-escalation, resulting in numerous incidents of officers unnecessarily using force resulting in serious bodily injury and death, particularly against people of color.

42. Further, Kansas City's training emphasized an "us-against-them" mentality and a desire to take care of fellow officers over the just and fair enforcement of the law.

43. This mentality was most prominently displayed in a 2019 KCPD training PowerPoint on fatal police shootings which strikes a defensive and argumentative tone while training officers that media coverage of police shootings are unfair and unreasonable, and that officer's problems are made worse by leaders who "made concessions" to "appease the inaccurate perceptions of the public." The training went

on to tell officers not to feel guilty about killing citizens because they are "the winner in a competition in which the winning prize is their life."

44. The Department also demonstrated tolerance of officer misconduct through its refusal to conduct meaningful investigations of the use of excessive and deadly force by its officers and the resultant lack of discipline for officers who violate civil rights.

45. The Department's investigatory policies are demonstrative of this; rather than turning the investigation of Kansas City Missouri Police use of deadly and excessive force over to independent investigators, policy required that the department investigate its own officers. Often times the Police Incident Investigation policy was not followed and the reports not forwarded through proper channels.

46. The Department refuses to investigate any complaint of excessive force that is made more than 90 days after the incident.

47. This means that misconduct goes unreviewed if the victim takes more than three months to recover from their injuries, to work up the courage to file a complaint, or simply to learn about the complaint process.

48. The Department also only permits victims to file a complaint. Witnesses who observe police misconduct cannot file a complaint.

49. KCPD also requires administrative hurdles before a complaint will be accepted, such as requiring the complaint to be notarized.

50. Further, even when complaints are timely filed and notarized and investigations launched, the Kansas City Board of Police Commissioners has demonstrated a consistent practice of allowing the reinstatement of officers to active duty while investigations into their roles in excessive force and fatal shooting cases are ongoing.

51. This practice conveys the message to officers that they will not be disciplined for their misconduct and to the public that their complaints are pointless and that the investigation is merely perfunctory.

52. Additionally, the Department has routinely allowed for the rejection of requests for criminal complaints against police officers.

53. While providing probable cause statements to prosecutors is a routine and unquestioned practice when it involves normal citizens, Chief Richard Smith has stated that he will never provide probable cause statements in officer- involved incidents investigated by the KCPD.

54. This position is particularly egregious given that Chief Smith and the KCPD refuse to allow outside agencies to investigate officer involved shooting.

55. Chief Smith's actions in withholding probable cause statements in investigations into police officers are designed to and have the effect of hindering investigation into misconduct.

56. In a letter addressed to Chief Smith and penned by Jackson County Prosecutor Jean Peters Baker, Ms. Baker expressed her concern with Chief Smith's actions stating, "By withholding a probable cause statement for an officer-involved incident, you are blocking the prosecutor's independent review of the facts under the law… Our system of government depends on checks and balances and oversight. Without such, the public will not have confidence in our decisions."

57. These policies and practices have served the purpose of conveying to officers that the use of excessive and deadly force is accepted and condoned by the Kansas City Police Department.

58.     These policies and practices have been enacted and perpetuated with the knowledge and authorization of Kansas City Board of Police Commissioners Mark Tolbert, Cathy Dean, Don Wagner, Dawn Cramer, and Quinton Lucas.

59.     Indeed, Kansas City Councilman Eric Bunch acknowledged as much when he recently publicly declared "officer brutality is common under [Chief] Smith's leadership" while calling for the Chief's resignation.

60.     The policies and practices designed to tolerate and cover-up for misconduct by officers are further reflected in Chief Smith's actions in relation to the investigation of the shooting of Cameron Lamb.

61.     Chief Smith appointed a former supervisor of Detective Schwalm and Defendant DeValkenaere to conduct the investigation into the shooting, and intentionally withheld this information from Jackson County Prosecutors, undermining the integrity of the investigation into Mr. Lamb's death.

*Ryan Stokes*

62.     On July 28, 2013, a drunk man falsely accused Ryan Stokes of stealing his phone prompting KCPD officers to chase after Stokes.

63.     During the chase, KCPD officer William Thompson shot Ryan in the back multiple times killing him.

64.     KCPD promulgated a story that Stokes was a thief who was armed, but June 2017 deposition testimony from former Officer Daniel Straub brought the truth to light – that Stokes was innocent, unarmed, and shot in the back.

65. In the two years following his testimony, Straub was aggressively pressured by supervisors and fellow officers into resigning from the KCPD and did so in September of 2019.

*Brionna Hill*

66. In May of 2019, Brionna Hill was viciously assaulted and slammed to the sidewalk by KCPD officers Matthew Brummett and Charles Prichard.

67. The involved officers reported that Ms. Hill was taken to the ground in order to take her into custody, but a video of the incident demonstrated that the officers repeatedly slammed Ms. Hill's face into the sidewalk and kneed her in the neck and torso.

68. An internal KCPD investigation found no misconduct.

69. However, an investigation by the Jackson County Prosecutor found that assault charges were warranted.

70. Chief Smith refused to allow a probable cause statement to be issued against the officers.

71. As a result, a grand jury had to be impaneled to consider the charges.

72. The grand jury later indicted the officers who pled guilty to felony assault and surrendered their POST licenses.

*Anthony Contreras*

73. In June of 2014, Anthony Contreras took off running after being approached by KCPD Officer Jacob Ramsey.

74. Even though Contreras was unarmed, Ramsey shot him in the back.

75. The Department did not return a probable cause statement against the officer, again requiring a grand jury to be impaneled.

76. The grand jury returned an indictment on felony assault and armed criminal action charges.

77.  The charges were eventually dropped before trial.

78.  A civil lawsuit resulting from the incident was subsequently settled for $475,000.

79.  Nonetheless, Kansas City Missouri Police Department returned Ramsey to active duty.

*Donnie Sanders*

80.  On March 12, 2020, Donnie Sanders was pulled over by a KCPD officer for a traffic violation.

81.  Sanders exited the vehicle and took off running.

82.  The KCPD officer followed and subsequently shot Sanders as he fled, killing him.

83.  Sanders was unarmed at the time.

84.  The KCPD officer was not disciplined or reprimanded in any way.

*Terrance Bridges and Unidentified 15-year-old Boy*

85.  In May of 2019, KCPD Officer Dylan Pifer shot and killed Terrance Bridges.

86.  Bridges was unarmed at the time of the killing.

87.  Unsurprisingly, KCPD found no issues with the killing and Pifer was returned to active duty just nine days after the shooting.

88.  Just six months later, Officer Pifer and his partner Sergeant Matthew Neal viciously assaulted an unidentified 15-year-old boy by restraining him and repeatedly slamming the boy's face into the ground, breaking his teeth and causing him to need six stitches in his forehead.

89.  A complaint was timely filed with KCPD and initially Pifer and Neal were found to have used excessive force.

90.  Then, Chief Smith intervened and mandated that the complaint against Pifer be dropped.

91.  As a result, no record of the incident will appear in Pifer's personnel file.

92.  Further KCPD refused to return a probable cause statement against Pifer or Neal.

93. As a result, a grand jury was impaneled, and Neal was indicted on third degree assault charges. Those charges remain pending.

94. A civil lawsuit stemming from the assault settled for nearly three-quarters of a million dollars.

95. Pifer remains on the KCPD force.

*Michael Simmons and Manuel Palacio*

96. In May of 2014, KCPD Officer Shannon Hansen pulled over Michael Simmons.

97. In his police report, Hansen claimed that Simmons had to be forced from the car after ignoring officer commands.

98. However, dash camera footage of the incident demonstrated that to be a lie.

99. Hansen approached the car and pulled Simmons out without ever giving a command.

100. Hansen then forced Simmons to the ground and threatened he would "take a knife and I'm going to cut your throat from ear to fucking ear."

101. A civil lawsuit from the incident was settled for $75,000.

102. Despite video evidence of Officer Hansen's excessive force and unprofessional language, and indisputable evidence that he lied on a police report, Hansen was not arrested or disciplined.

103. That same day, Manuel Palacio was arrested for a robbery also by Officer Hansen.

104. When KCPD officers arrived on scene, Palacio immediately dropped to the ground and was handcuffed by officers.

105. Then, minutes after, Officer Shannon Hansen viciously assaulted Palacio by repeatedly punching the handcuffed man in the head and verbally abusing and threatening him.

106. As a result of the incident, a civil lawsuit was settled for $300,000.

107. This vicious assault was caught on video as well.

108. Nonetheless, Officer Hansen was not arrested or disciplined.

109. Nor was Officer Hansen terminated from the KCPD.

*Philippe Lora*

110. In November 2013, KCPD officers were investigating a carjacking when Philippe Lora began to drive away in his SUV.

111. Kansas City Missouri Police Department officers opened fire, discharging at least 26 times, striking and paralyzing Lora.

112. Lora had committed no crime, was unarmed, and had not threatened the officers or anyone else.

113. The Kansas City Police Department officers claimed they heard gunshots which prompted them to open fire on Lora, but this was demonstrated to be false as no weapon was recovered.

114. The incident resulted in a $4.8 million dollar settlement.

115. Despite their killing of an unarmed man and the massive settlement, the discharging officers – Dakota Merrill and Shane Mellot – were not terminated and remained with the department until Merrill shot another black man without cause.

*Josh Bills*

116. In December of 2013, Josh Bills was walking near his home when five KCPD officers approached him responding to a call about a suspicious "Black man, black clothing."

117. Without warning, one of the officers kicked Bills' legs out from under him, smashing his face into the concrete.

118. The officers faced no internal discipline, nor was a probable cause statement returned against any of them.

119. The incident led to a lawsuit by the ACLU of Missouri on Mr. Bills' behalf.

## WRONGFUL DEATH ACTION

120. Plaintiffs bring these claims pursuant to the Missouri Wrongful Death Statute, § 537.080 et seq. Mo.R.Stat., on behalf of C.L., J.L., C.L., C.A.L. and Laurie Bey and those persons entitled by law to recover damages as a result of the wrongful death of Cameron Lamb.

121. No other action has been brought to recover for Cameron Lamb's death under the aforementioned statutes.

122. Plaintiffs claim all available damages under the Missouri Wrongful Death statute.

## COUNT I: FOURTH AMENDMENT VIOLATION
## AGAINST DEFENDANT DEVALKENAERE

123. Plaintiffs hereby incorporate all preceding paragraphs as if fully stated herein.

124. Plaintiffs would show that Defendant DeValkenaere violated Cameron Lamb's Fourth Amendment rights when he entered upon Mr. Lamb's property without a warrant or legal right to do so.

125. As a result of Defendant's unlawful entry, Lamb suffered extreme and severe mental and emotional distress, anxiety, terror and agony, immense pain and was ultimately shot and painfully killed by Defendant Devalkenaere.

126. Plaintiffs seek all available wrongful death damages under the law.

**WHEREFORE**, Plaintiffs demand judgment in their favor, and against Defendant DeValkenaere, pursuant to 42 U.S.C. § 1983, in an amount in excess of $10 million, including compensatory damages, punitive damages, damages for aggravating circumstances, funeral expenses, loss of services, companionship, comfort, instruction, guidance, counsel, training, and support, conscious pain and suffering, interest, delay damages, and costs of suit as

provided by law, attorneys' fees under 42 U.S.C §§ 1985 and 1988, and any other damages legally appropriate at the time of jury trial.

## COUNT II: FOURTH AMENDMENT VIOLATION
## AGAINST DEFENDANT DEVALKENAERE

127. Plaintiffs hereby incorporate all preceding paragraphs as if fully stated herein.

128. Plaintiffs would show that Defendant DeValkenaere violated Cameron Lamb's Fourth Amendment rights when he shot and killed Lamb.

129. DeValkenaere failed to act as an objectively reasonable officer would have acted in the same or similar circumstances. That is, Defendant DeValkenaere, without justification and the need to do so pointed his firearm at Mr. Lamb's head and discharged, killing him.

130. The excessive and deadly force used by Defendant DeValkenaere was not objectively reasonable, justified, nor was it necessary under the circumstances.

131. Plaintiff would show that Defendant DeValkenaere denied Lamb of his right to be free from the use of excessive force in violation of the 4th Amendment to the United States Constitution.

132. Defendant DeValkenaere embarked on a willful, malicious, reckless and outrageous course of conduct that was intended to cause and, in fact, caused Lamb to suffer extreme and severe mental and emotional distress, anxiety, terror and agony, immense pain and a painful death.

133. Plaintiffs seek all available wrongful death damages under the law.

**WHEREFORE**, Plaintiffs demand judgment in their favor, and against Defendant DeValkenaere, pursuant to 42 U.S.C. 1983, in an amount in excess of $10 million, including compensatory damages, punitive damages, damages for aggravating circumstances, funeral expenses, loss of services, companionship, comfort, instruction, guidance, counsel, training, and

support, conscious pain and suffering, interest, delay damages, and costs of suit as provided by law, attorneys' fees under 42 U.S.C. §§ 1985 and 1988, and any other damages legally appropriate at the time of jury trial.

**COUNT III: MUNICIPAL LIABILITY**
**AGAINST DEFENDANT KANSAS CITY BOARD OF POLICE COMMISSIONERS BY AND THROUGH MARK TOLBERT, CATHY DEAN, DON WAGNER, DAWN CRAMER AND QUINTON LUCAS IN THEIR OFFICIAL CAPACITIES**

134. Plaintiffs hereby incorporate all preceding paragraphs as if fully stated herein.

135. The customs, practices, and policies of the Kansas City Missouri Police Department were the moving force behind Defendant DeValkenaere's violation of Cameron Lamb's constitutional rights.

136. Lamb was deprived of rights and privileges secured to him by the United States Constitution and by other laws of the United States, by the Kansas City Board of Police Commissioners through its many failures addressed *supra.*

137. The previous and then-existing members of the Kansas City Board of Police Commissioners had knowledge of the continuing, widespread, persistent pattern of unconstitutional misconduct of the Kansas City Missouri Police Department as discussed herein.

138. Despite this knowledge, the Kansas City Board of Police Commissioners failed to take the necessary steps to rectify the unconstitutional misconduct and adequately protect the constitutional rights of the people of Kansas City.

139. This unconstitutional misconduct and the refusal to rectify it was the moving force behind the deprivation of Cameron Lamb's constitutional rights.

140. Plaintiffs seek all available wrongful death damages under the law.

**WHEREFORE**, Plaintiffs demand judgment in their favor, and against Defendant Kansas City Board of Police Commissioners pursuant to 42 U.S.C. § 1983, in an amount in excess of $10 million, including compensatory damages, funeral expenses, loss of services, companionship, comfort, instruction, guidance, counsel, training, and support, conscious pain and suffering, interest, delay damages, and costs of suit, attorneys' fees under 42 U.S.C §§ 1985 and 1988, and any other damages legally appropriate at the time of jury trial.

### COUNT IV: FOURTEENTH AMENDMENT DENIAL OF MEDICAL CARE AGAINST DEFENDANT KANSAS CITY BOARD OF POLICE COMMISSIONERS BY AND THROUGH MARK TOLBERT, CATHY DEAN, DON WAGNER, DAWN CRAMER AND QUINTON LUCAS IN THEIR OFFICIAL CAPACITIES

141.    Plaintiffs hereby incorporate all preceding paragraphs as if fully stated herein.

142.    The Kansas City Board of Police Commissioners maintain a formal policy called "Procedural Instruction No. 14-02."

143.    Procedural Instruction No. 14-02 provides that officers **must** procure emergency transportation to a hospital when it is requested, however the policy explicitly declines to mandate that officers to transport a victim of a police shooting to the hospital immediately.

144.    Rather, the policy provides officers with discretion to determine whether or not a shooting victim requires transport to the hospital.

145.    Following the shooting of Cameron Lamb, Kansas City police officers restricted any medical care or ambulance from attending to Mr. Lamb for more than thirty minutes despite an ambulance arriving on the scene.

146.     As a result of this policy and the officers' refusal to allow emergency medical personnel to reach Mr. Lamb, he was caused to suffer extreme pain and discomfort from his injuries, eventually resulting in his death.

147.     The denial of the medical treatment to Mr. Lamb by Kansas City officers in accordance with this policy served to violated Mr. Lamb's Fourteenth Amendment Due Process rights.

148.     Plaintiffs seek all available wrongful death damages under the law.

     **WHEREFORE**, Plaintiffs demand judgment in their favor, and against Defendant Kansas City Board of Police Commissioners pursuant to 42 U.S.C. § 1983, in an amount in excess of $10 million, including compensatory damages, funeral expenses, loss of services, companionship, comfort, instruction, guidance, counsel, training, and support, conscious pain and suffering, interest, delay damages, and costs of suit, attorneys' fees under 42 U.S.C §§ 1985 and 1988, and any other damages legally appropriate at the time of jury trial.


## COUNT V: FOURTH AMENDMENT RATIFICATION
## AGAINST DEFENDANT KANSAS CITY BOARD OF POLICE COMMISSIONERS BY AND THROUGH MARK TOLBERT, CATHY DEAN, DON WAGNER, DAWN CRAMER AND QUINTON LUCAS IN THEIR OFFICIAL CAPACITIES

149.     Plaintiffs hereby incorporate all preceding paragraphs as if fully stated herein.

150.     The Jackson County, Missouri Prosecutor's Office investigated the shooting of Cameron Lamb.

151.     After concluding their investigation, the Jackson County Prosecutor's Officer requested a probable cause statement from the Kansas City Police Department.

152.     In accordance with the aforementioned policy of refusing to provide probable cause statements against officers, the Kansas City Police Department refused to provide a probable cause statement in this matter.

153.    At all times relevant hereto, KCPD had in place KCPD Policy 335-4 on Civil Rights Investigations.

154.    The policy incorporates a Memorandum of Understanding between KCPD and the Federal Bureau of Investigation, the Jackson County Prosecutor's Office, and the United States Attorney's Office, Western District of Missouri that requires KCPD to notify these three agencies.

155.    KCPD did not notify any of the three agencies of the events regarding the shooting of Cameron Lamb

156.    KCPD did not notify the FBI or the United States Attorney's office even after it was notified by the Jackson County Prosecutor's office of the possible civil rights violations against Mr. Lamb.

157.    Further, Policy 335-4, requires, when becoming aware of even a potential civil rights violation, any member of KCPD to complete Interdepartment Communication, Form 191 P.D. and forward it through the chain of command or to report the violation to the Department of Justice, Office of Civil Rights. The KCPD did not follow this procedure.

158.    Further, Policy 335-4 requires the Deputy Chief of the Investigations Bureau to notify the FBI and the US Attorney's office, who failed to do so.

159.     KCPD Policy 308-4 gave Chief Smith the ability to order an Internal Affairs Investigation of the shooting of Cameron Lamb. Chief Smith failed or refused to do so.

160.    KCPD Policy 16-02 is the policy involving handling police involved incidents. "The objective is to ensure the fair and thorough investigation of any major incident involving a member of the Kansas City Missouri Police Department … while taking the necessary precautions to identify and manage potential civil liability and other risks."

161.    Policy 16-02 includes "any incident that involves a member discharging their

official duties and results in … serious bodily injury." "Serious bodily injury" is defined as "any injury where an injured person is transported from the scene of an incident to receive medical attention and the nature of the injuries indicate the injured person will likely be admitted to a hospital for treatment."

162.   KCPD failed to follow Policy 16-02, including conducting an investigation, forwarding the file to the prosecutor for review, forward the file to the Internal Affairs Unit, or require the involved officers to give a statement within 48 hours.

163.   KCPD also failed to follow Policy 16-02 by convening a Notable Event Review Panel which could identify any administrative, supervisory, training, tactical or written directive issues that need to be addressed.

164.   Instead of honestly and fairly investigating the injuries to Cameron Lamb, the Board's and the Kansas City Missouri Police Department's efforts were immediately directed at creating and continuing the narrative that the shooting of Mr. Lamb was justified.

165.   With the blessing and ratification of the Board and the Kansas City Missouri Police Department, Smith refused to allow a probable cause statement to be issued to the Jackson County Prosecutor, and in the press, Cameron Lamb was needlessly vilified, causing irreparable harm to his family, including but not limited to the Plaintiffs.

166.   These actions demonstrate the deliberate indifference of the Board to the constitutional rights of the citizens of Kanas City, Missouri, which actions were made with the Board's acquiescence and/or ratification.

167.   All the actions described in this count amount to ratification by Defendant Board of DeValkenaere's unconstitutional excessive force, and thus evidence of a pre-existing policy, custom, policy and practice.

**WHEREFORE**, Plaintiffs demand judgment in their favor, and against Defendant Kansas City Board of Police Commissioners pursuant to 42 U.S.C. § 1983, in an amount in excess of $10 million, including compensatory damages, funeral expenses, loss of services, companionship, comfort, instruction, guidance, counsel, training, and support, conscious pain and suffering, interest, delay damages, and costs of suit, attorneys' fees under 42 U.S.C §§ 1985 and 1988, and any other damages legally appropriate at the time of jury trial.

Respectfully submitted,

/s/ John J. Coyle

**MCELDREW PURTELL**
Daniel N. Purtell, Esq.
 PA Bar I.D. 310376
John J. Coyle, Esq.
 PA Bar I.D. 312084
Mark V. Maguire, Esq.
 PA Bar I.D. 94242
123 South Broad Street
Suite 2250
Philadelphia, PA 19109 215-545-8800
dan@mceldrewpurtell.com
jcoyle@mceldrewpurtell.com
mmaguire@mceldrewpurtell.com

**REED SMITH LLP**
John P. Kennedy, Esq.
 NY Bar I.D. 5553870
599 Lexington Avenue
22nd Floor New York, NY 10022
jkennedy@reedsmith.com
Rizwan A. Qureshi, Esq.
 D.C. Bar I.D. 1024603
1301 K Street, N.W.
Suite 1000
Washington, D.C. 20005
202-414-9200
rqureshi@reedsmith.com

**KRAUSE & KINSMAN**
Adam Krause, Esq.
MO Bar I.D. 67462
4717 Grand Ave. #300
Kansas City, MO 64112
816-307-2763
adam@krauseandkinsman.com

 /s/ David R. Smith
**DAVID R. SMITH, PC**
David R. Smith, Esq.
MO Bar I.D. 39088
4310 Madison Avenue, Suite 100
Kansas City, Missouri 64111
816-753-9393