IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| CHAZMINE ENGLISH,<br>as p/n/g of C.L. and J.L., *et al.*,<br><br>              Plaintiffs,<br>v.<br><br>ERIC J. DeVALKENAERE, *et al.*,<br><br>              Defendants. | No. 21-00446-CV-W-BP |

**ORDER (1) GRANTING IN PART PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON COUNTS I AND II AND (2) DENYING DEFENDANT ERIC DeVALKENAERE'S MOTION FOR SUMMARY JUDGMENT ON COUNTS I AND II**

Now pending are portions of Plaintiffs' Motion for Partial Summary Judgment, (Doc. 86), and Defendants' Motion for Summary Judgment on All Claims, (Doc. 88). The only portions of the cross-motions yet to be ruled are requests by Plaintiffs and Defendant Eric DeValkenaere[1] for summary judgment on Counts I and II.[2] Plaintiffs are granted partial summary judgment on Count I, and neither party is granted summary judgment on Count II.

## I. BACKGROUND[3]

On December 3, 2019, Detective Troy Hill of the Kansas City Police Department (the "KCPD") observed a multi-vehicle high-speed car chase and radioed a KCPD helicopter, asking it to look for the vehicles. The helicopter operators located a red truck that matched Hill's description and broadcast information regarding its whereabouts.

---

[1] At times, the state courts have spelled Defendant's name as "Devalkenaere." The Court utilizes the spelling he has adopted for himself.

[2] The Court previously granted all Defendants summary judgment on Counts III, IV, and V. (Doc. 103.) DeValkenaere is the only Defendant named in Counts I and II.

[3] Where citations to the Record are not provided, the fact in question has been agreed to by the parties.

Two other members of Hill's team—Detectives Troy Schwalm and Eric DeValkenaere—heard the radio conversation regarding the car chase. Later, the helicopter operators reported the red truck was moving in reverse down a driveway that led to the backyard of a residence and stated this was an opportune time for officers to approach. Schwalm and DeValkenaere responded, and both officers proceeded to the residence's backyard via different routes. Schwalm approached via the driveway, which was on the left (or south) side of the house. DeValkenaere approached the backyard by circling around the right (or north) side of the house.

Schwalm arrived on the scene first, and he got to the backyard first. When he arrived, Lamb was backing the truck into a garage or carport behind the house. Schwalm was positioned closest to the driver's side of the truck; he saw Lamb in the truck and made eye contact with him. He also directed Lamb to turn off the truck. DeValkenaere was positioned on a retaining wall next to the driveway on the passenger's side and heard Schwalm's commands to Lamb.

DeValkenaere fatally shot Lamb. There is conflicting evidence as to what preceded the shooting; the Court will set forth that evidence, but it is not the Court's role to resolve what happened that afternoon.

When viewed in the light most favorable to DeValkenaere, the Record reflects he saw Lamb pull a gun from his waistband with his left hand and put it between his legs, pointed at the floorboard, while holding onto the steering wheel with his right hand. (Doc. 89-2, pp. 24-25 (DeValkenaere Dep., pp. 77, 81).)[4] DeValkenaere then warned Schwalm that Lamb had a gun as Lamb brought the gun up between the left side of the steering wheel and the door on that side (that is, the side closest to Schwalm) and "brought [it] towards" Schwalm. (Doc. 89-2, pp. 26-27

---

[4] Unless otherwise indicated, the page numbers for documents filed with the Court are those generated by the CM/ECF system.

(DeValkenaere Dep., pp. 82-83).) DeValkenaere then shot Lamb through the windshield, killing him.

When the evidence is viewed in the light most favorable to Plaintiffs, the Record reveals that Lamb was not armed and did not move in the manner DeValkenaere described. Schwalm stated that Lamb was waving at him with his left hand out the driver's side window, (Doc. 90-4, p. 3; Doc. 87-2, p. 155; Doc. 90-3, pp. 56-57 (Schwalm Dep., pp. 56-57)), Lamb's fingers were splayed open, and Schwalm never saw a gun. (Doc. 90-3, pp. 38, 45 (Schwalm Dep., pp. 38, 45).)[5] After DeValkaenere shot him, Lamb slumped or tilted over to the right side, toward the passenger seat, (Doc. 87-2, pp. 160-61), and the truck rolled down the driveway toward the house until it came to rest inside the garage.

In June 2020, DeValkenaere was charged with first-degree involuntary manslaughter and armed criminal action in Missouri state court; after a bench trial, he was convicted of second-degree involuntary manslaughter and armed criminal action. *See State of Missouri v. Eric J. DeValkenaere*, No. 2016-CR02823 (Cir. Ct. of Jackson Cnty, Mo., filed June 18, 2020). The conviction was affirmed on appeal. *See State v. Devalkenaere*, 684 S.W.3d 1 (Mo. Ct. App. 2023).[6]

---

[5] DeValkenaere suggests Schwalm could not confirm that the empty hand he saw was Lamb's left hand. (Doc. 94, p. 22.) However, construing the evidence in Plaintiffs' favor, one can infer Schwalm saw Lamb's left hand; if Lamb was waving outside the driver's side door with his right hand and steering with his left, he would have been reaching across his body to get his right hand out the window—which does not make sense and no witness testified this happened. Moreover, it contrasts with DeValkenaere's own testimony that Lamb was steering with his right hand. (The Court acknowledges that Schwalm gave slightly different accounts of what he saw at different times, but again – here, the Court is considering the evidence in the light most favorable to Plaintiffs.)

[6] The parties have provided some information from DeValkenaere's criminal case. (*See, e.g.*, Doc. 87-2 (trial court transcript); Doc. 87-3 (trial court docket sheet); Doc. 87-4 (order of conviction); Doc. 91-5 (transcript of court issuing verdict); Doc. 91-6 (appellate court docket sheet).) The Court takes judicial notice of all the state court proceedings, *see Stutzka v. McCarville*, 420 F.3d 757, 760 n.2 (8th Cir. 2005) (explaining courts "may take judicial notice of judicial opinions and public records[.]"), and sometimes references information from documents not filed in this case.

Plaintiffs filed this civil case in June 2021. Their operative pleading is their Second Amended Complaint, (Doc. 49), and as stated earlier only Counts I and II remain. Count I alleges DeValkenaere violated Lamb's Fourth Amendment rights by entering the backyard without a legal right to do so, and Count II alleges DeValkenaere violated Lamb's Fourth Amendment rights by using excessive force. Boths sides seek summary judgment; the Court addresses the parties' arguments below, setting out additional facts as necessary.

## II. DISCUSSION

A moving party is entitled to summary judgment on a claim only upon a showing "that there is no genuine issue of material fact and [it] is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). "[W]hile the materiality determination rests on the substantive law, it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Thus, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Wierman v. Casey's Gen. Stores*, 638 F.3d 984, 993 (8th Cir. 2011) (quotation omitted).

In applying this standard, the Court must view the evidence in the light most favorable to the non-moving party, giving that party the benefit of all inferences that may be reasonably drawn from the evidence, *e.g.*, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986), and "should not weigh the evidence, make credibility determinations, or attempt to determine the truth of the matter." *Leonetti's Frozen Foods, Inc. v. Rew Mktg., Inc.*, 887 F.3d 438, 442 (8th Cir. 2018) (quotation omitted). A party opposing a motion for summary judgment may not simply deny the allegations but must point to evidence in the Record demonstrating the

existence of a factual dispute. Fed. R. Civ. P. 56(c)(1); *Conseco Life Ins. Co. v. Williams*, 620 F.3d 902, 909-10 (8th Cir. 2010).

Finally, while both sides' requests for summary judgment discuss whether DeValkenaere violated Lamb's constitutional rights, DeValkenaere also argues he is entitled to summary judgment based on qualified immunity. The qualified immunity analysis subsumes the determination of whether a constitutional violation occurred. "Qualified immunity involves the following two-step inquiry: (1) whether the facts shown by the plaintiff make out a violation of a constitutional or statutory right, and (2) whether that right was clearly established at the time of the defendant's alleged misconduct." *Mitchell v. Shearrer*, 729 F.3d 1070, 1074 (8th Cir. 2013). The Court has the discretion to address these prongs in either order. *E.g.*, *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

## A. Count I – Entry Onto the Property

### *1. Whether DeValkenaere violated the Fourth Amendment*

The Court begins its analysis of Count I by discussing whether Lamb's rights were violated. On this issue, the state court's final judgment regarding DeValkenaere's guilt provides a conclusive answer because it determined (1) the backyard constituted part of the property's curtilage and (2) DeValkenaere was not lawfully present on Lamb's property. (Doc. 91-5, pp. 5-12.)

After the parties' summary judgment motions were briefed, the Court solicited additional input from the parties regarding the preclusive effect of the state court's judgment. (Doc. 104.) In his response, DeValkenaere concedes he is estopped from denying that he violated Lamb's Fourth Amendment rights by entering the backyard:

> Given the current posture of this case and the developments in the state criminal proceedings since the parties last addressed this issue, DeValkenaere has no choice

5

> but to concede that he is estopped at this juncture from asserting that his entry into the backyard of the residence did not violate the Fourth Amendment.

(Doc. 106, p. 3.) Thus, Plaintiffs are entitled to summary judgment on the question of whether DeValkaenere violated the Fourth Amendment by entering the backyard.

### 2. Whether the Right was Clearly Established

The second qualified immunity prong asks whether the right DeValkenaere violated was clearly established. A right is "clearly established" if "at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful." *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018).

As explained above, the state courts determined (and the Court must therefore accept) that the house's backyard constituted curtilage. DeValkenaere argues it was not clearly established he could not enter the curtilage to conduct a "knock and talk;" that is, to simply talk to Lamb. It does not appear DeValkenaere specifically argued to the state courts that he could constitutionally enter the curtilage to knock on the door or simply talk to Lamb. According to the Missouri Court of Appeals, DeValkenaere argued exigent circumstances justified his entry onto the property, *Devalkenaere*, 684 S.W.3d at 22-23—a point with which the Court of Appeals disagreed. However, the factual findings made by the state courts—factual findings that are binding here—demonstrate a reasonable officer in DeValkenaere's position would have known he could not access the backyard as he did in order to conduct a "knock and talk".

At the time of the shooting, it was well established that "[t]he Fourth Amendment's protection extends to the curtilage surrounding a home." *United States v. Weston*, 443 F.3d 661, 666 (8th Cir. 2006) (citing *United States v. Dunn*, 480 U.S. 294, 301 (1987)). However, "[w]here a legitimate law enforcement objective exists, a warrantless entry into the curtilage is not unreasonable under the Fourth Amendment, provided that the intrusion upon one's privacy is

limited." *United States v. Robbins*, 682 F.3d 1111, 1115 (8th Cir. 2012). Law enforcement officers typically may enter curtilage to knock on the front door because that is something a member of the public can do. *E.g.*, *Florida v. Jardines*, 569 U.S. 1, 8 (2013); *United States v. Wells*, 648 F.3d 671, 679 (8th Cir. 2011); *Weston*, 443 F.3d at 667. Moreover, "[w]here officers acting in furtherance of a legitimate law enforcement objective develop a reasonable belief that someone is present in the home, they are justified in proceeding to an alternative entrance following an unsuccessful knock at the front door." *Robbins*, 682 F.3d at 1116 (8th Cir. 2012). Thus, in December 2019, it was clearly established that if an officer received no answer at the front door, he could enter the backyard if he had reason to believe the person he wanted to talk to was located there. *Id.* (citing *United States v. Raines*, 243 F.3d 419, 420-21 (8th Cir. 2001)). It was not clearly established, however, whether an officer was *required* to ring the doorbell if he already knew the person he wanted to speak with was in the backyard. *See Wells*, 648 F.3d at 680 ("We are not prepared to extend the 'knock-and-talk' rule to situations in which the police forgo the knock at the front door and, *without any reason to believe the homeowner will be found there*, proceed directly to the backyard." (emphasis supplied)). Thus, the law did not clearly require DeValkenaere to ring the doorbell when he knew Lamb was in the backyard.[7]

However, this is not the end of the inquiry. In December 2019, it was clearly established a police officer's license to enter curtilage to conduct a knock and talk was limited; he could enter curtilage only to the extent that the public could. *See, e.g., Jardines*, 569 U.S. at 8; *Wells*, 648 F.3d at 679; *Weston*, 443 F.3d at 667. Thus, for instance, while the police may ordinarily approach the front door to knock, and can open an unlocked gate to do so, they cannot unlock a locked gate

---

[7] In August 2020—after the events giving rise to this case—the Eighth Circuit held officers did not violate the Fourth Amendment when they proceeded directly to the backyard because they "already knew" the person they wanted to talk to was there and "the officers were not required to make a pointless trip to the front door." *United States v. Bennett*, 972 F.3d 966, 973 (8th Cir. 2020).

7

or bypass other measures intended to prevent entry by the public. *See Robbins*, 682 F.3d at 1115; *United States v. Lakoskey*, 462 F.3d 965, 973 (8th Cir. 2006); *Weston*, 443 F.3d at 667.

Here, the undisputed facts establish that DeValkenaere wanted to talk to Lamb, and he knew Lamb was in the backyard. The state trial court found the north side of the property (the side DeValkenaere entered from) "was enclosed by a fence and shielded from view by bushes," and the west side (i.e., the backyard) "was similarly fenced and shielded from view by trees and bushes" and "not able to be seen from the street." (Doc. 91-5, pp. 10-11.) In addition, "a large barbecue grill and car hood had been situated on the northwest corner of the residence for the express purpose of shielding the backyard and carport area from public view." (Doc. 91-5, pp. 11-12.) The Missouri Court of Appeals further explained that "[a] fence-like barricade *blocked* Devalkenaere from entering the backyard of the house. Devalkenaere *kicked over this barricade* and entered the backyard." *State v. Devalkenaere*, 684 S.W.3d 1, 9 (Mo. Ct. App. 2023) (emphasis supplied). Finally, the state trial court found "there was insufficient evidence from which the Court can conclude that this area or the carport area were open to the public or otherwise placed where the public was invited as those phrases have developed under the law." (Doc. 91-5, p. 11.)

Thus, the uncontroverted facts demonstrate DeValkenaere accessed the property via means not accessible to the public, in that he bypassed and removed barricades intended to prevent people from coming into the backyard. A reasonable officer in this situation would have known, based on clearly established law, that he could not enter the curtilage in this manner to conduct a "knock and talk," even if he knew the person he wanted to talk to was in the backyard. Therefore, DeValkenaere is not entitled to qualified immunity on Count 1.

### *3. Conclusion*

The preclusive effect of the state court's judgment requires the Court to conclude DeValkenaere violated the Fourth Amendment by entering the backyard. The state courts' factual findings, which are binding on the Court, establish facts from which a reasonable officer would have known he could not enter the backyard in the manner DeValkenaere did. Therefore, he is not entitled qualified immunity and Plaintiffs are entitled to partial summary judgment on Count I. The issue of damages remains pending.

### B. Count II – Excessive Force

#### *1. Plaintiffs' Motion for Summary Judgment*

Plaintiffs rely solely on the collateral estoppel effect of the state court judgment to support their Motion for Summary Judgment. (*See* Doc. 87, pp. 10-13.) Federal courts "apply the collateral-estoppel doctrine of . . . the state that issued the potentially preclusive judgment." *Riis v. Shaver*, 4 F.4th 701, 703-04 (8th Cir. 2021). Missouri courts consider the following factors when determining if collateral estoppel applies:

> (1) whether the issue decided in the prior adjudication was identical to the issue presented in the present action; (2) whether the prior adjudication resulted in a judgment on the merits; (3) whether the party against whom estoppel is asserted was a party or was in privity with a party to the prior adjudication; and (4) whether the party against whom collateral estoppel is asserted had a full and fair opportunity to litigate the issue in the prior suit.

*Cooperative Home Care, Inc. v. City of St. Louis*, 514 S.W.3d 571, 581 (Mo. 2017) (en banc) (quotation omitted). Collateral estoppel "applies only to those issues that were necessarily and unambiguously decided." *State ex rel. Johns v. Kays*, 181 S.W.3d 565, 566 (Mo. 2006) (en banc). Additionally, it "will not be applied where to do so would be inequitable," and "[e]ach case must be analyzed on its own facts." *James v. Paul*, 49 S.W.3d 678, 683 (Mo. 2001) (en banc).

A claim of excessive force is evaluated under the Fourth Amendment, *e.g.*, *Graham v. Connor*, 490 U.S. 386, 394 (1989), and Plaintiffs argue the state court necessarily concluded DeValkenaere used excessive force when it found him guilty of second-degree involuntary manslaughter and armed criminal action. They first point out (correctly) that "[i]n assessing a claim of excessive force, courts ask whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them." *McDaniel v. Neal*, 44 F.4th 1085, 1090 (8th Cir. 2022). They then point out (correctly) that the state trial court found DeValkenaere was not acting in lawful defense of himself or Schwalm because DeValkenaere and Schwalm were not lawfully in the backyard. (Doc. 91-5, pp. 12-13.) From this, Plaintiffs conclude the state trial court found DeValkenaere was not acting reasonably within the meaning of the Fourth Amendment. (Doc. 106, pp. 8-9.) However, despite the similarity in the standards' descriptions, a determination of whether DeValkenaere used excessive force involves different factors, and thus a different inquiry, from whether he committed involuntary manslaughter in the second degree.

In evaluating a Fourth Amendment excessive force claim, the Court considers "whether the officer's actions were objectively reasonable in light of the facts and circumstances confronting him." *Liggins v. Cohen*, 971 F.3d 798, 800 (8th Cir. 2020). This requires examining the totality of the circumstances, *id.*, including the threat purportedly facing the officer at the time force is used. *See Banks v. Hawkins*, 999 F.3d 521, 526 (8th Cir. 2021) (citing *Gardner v. Buerger*, 82 F.3d 248, 253 (8th Cir. 1996)). "An excessive force claim is a claim that a law enforcement officer carried out an unreasonable seizure through a use of force that was not justified under the relevant circumstances. It is not a claim that an officer used reasonable force after committing a distinct Fourth Amendment violation such as an unreasonable entry." *County of Los Angeles v. Mendez*, 581 U.S. 420, 428 (2017). "If there is no excessive force under [the relevant standard] there is no

excessive force claim at all. To the extent that a plaintiff has other Fourth Amendment claims, they should be analyzed separately." *Id*. at 429. Thus, DeValkenaere's violation of the Fourth Amendment by entering the property may have been sufficient, under state law, to support a conviction for second-degree involuntary manslaughter, but it does not automatically mean his use of force was unreasonable and therefore excessive within the meaning of the Constitution. For instance, if an officer enters a property in violation of the Fourth Amendment and, once there, observes an occupant threatening to shoot another occupant, it may be reasonable for the officer to use deadly force to protect the would-be victim, notwithstanding the fact that the officer's entry violated the Constitution.

Moreover, the factual findings the state trial court made to determine DeValkenaere was guilty of second-degree involuntary manslaughter do not bear on whether DeValkeneaere committed excessive force under the Constitution. As the Missouri Court of Appeals explained,

> A person commits the offense of involuntary manslaughter in the second degree if he or she acts with criminal negligence to cause the death of any person. Thus, in order to convict Devalkenaere of involuntary manslaughter in the second degree, the prosecution was required to establish that Devalkenaere caused [Lamb's] death, and that Devalkenaere acted with criminal negligence in doing so. A person acts with criminal negligence when he or she fails to be aware of a substantial and unjustifiable risk that circumstances exist or a result will follow, and such failure constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation.

*DeValkenaere*, 684 S.W.3d at 11-12 (citations, quotations, and footnote omitted). This inquiry is different from the standard for determining if the use of force is excessive, as further demonstrated by the trial court's explanation for its verdict. Specifically, it found that when DeValkenaere entered the property,

> he did so without considering or being aware of the substantial and unjustifiable risks associated with his conduct, including but not limited to the fact that [he was] unlawfully on the property, that [he and Schwalm] were both escalating a situation

11

> that previously had deescalated, and that their actions created or exacerbated the risk that what ultimately occurred would.

(Doc. 91-5, p. 13.) The court then concluded DeValkanaere's "conduct was a gross deviation from the standard of care that a reasonable person would exercise in the situation and constituted criminal negligence as that phrase is defined under Missouri law." (Doc. 91-5, pp. 13-14.) At no point did the state courts evaluate, much less decide, whether the shooting was "excessive" under the standards set by the Constitution.

For these reasons, the Court concludes the state trial court's decision does not collaterally estop DeValkenaere from arguing he did not use excessive force under the Fourth Amendment. Therefore, Plaintiffs' argument for summary judgment in their favor is rejected.

### 2. *DeValkenaere's Motion for Summary Judgment*

As stated earlier, when assessing the excessive force claim, the Court must evaluate whether DeValkenaere's actions were objectively reasonable in light of the facts confronting him. More specifically, the inquiry considers "whether the totality of the circumstances—including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officer or others, and whether the suspect is actively fleeing or resisting arrest—justifies a particular sort of seizure." *Liggins*, 971 F.3d at 800. Reasonableness is judged from the perspective of a reasonable officer on the scene, rather than with the benefit of hindsight, giving due regard to an officer's need to make split-second decisions based on evolving circumstances. *E.g., Graham*, 490 U.S. at 396–97; *Estate of Morgan v. Cook*, 686 F.3d 494, 497 (8th Cir. 2012). It is well-established that "deadly force is justified where the totality of the circumstances give[s] the officer probable cause to believe that a . . . suspect poses a threat of serious physical harm to the officer or to others." *Thompson v. Hubbard*, 257 F.3d 896, 899 (8th Cir. 2001). Conversely, it is also well-established that deadly force is not justified if a person does not pose a threat of

12

serious physical harm to the officers or others. "Thus, to defeat the motion for summary judgment, the plaintiffs need[ ] to present enough evidence to permit a reasonable jury to conclude that [the officer's] use of deadly force was objectively unreasonable." *Id.*

DeValkenaere argues he acted reasonably under the circumstances because he saw Lamb pull a gun from his waistband and point it toward Schwalm. (Doc. 89, p. 27.) Alternatively, he argues he is entitled to qualified immunity because "[i]t was not clearly established that [he] could not reasonably assume that Lamb posed a serious threat when . . . instead of keeping his hands on the steering wheel, [Lamb] reached down to his waist for a gun . . . and raised it in the direction of Schwalm." (Doc. 89, p. 27.) The problem with DeValkenaere's argument is that it considers the evidence in the light most favorable to him, and not to Plaintiffs. As discussed in Part I, there is evidence in the Record (primarily, Schwalm's statements and testimony) that might cause the jury to conclude Lamb did not reach his hand to his waistband or make any other movements indicating that he was drawing a weapon and aiming at Schwalm. And, if that is what the jury believes, it may also believe that DeValkenaere did not act reasonably in utilizing deadly force. Because there is a factual dispute as to what happened (and, hence, a factual dispute as to what DeValkenaere saw) summary judgment cannot be granted. The factual dispute also precludes the Court from concluding whether DeValkenaere is entitle to qualified immunity.

### III. CONCLUSION

With respect to Count I, Plaintiff is granted partial summary judgement with the issue of damages remaining. The parties' requests for summary judgment on Count II is denied.

**IT IS SO ORDERED.**

                                               /s/ Beth Phillips
                                               BETH PHILLIPS, CHIEF JUDGE
DATE: September 18, 2024                 UNITED STATES DISTRICT COURT